1          10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30         39 40 41 42 43 44 45 46 47 48 49 50 51 52 53 54 55 56 57 58 59         68 69 70 71 72 73 74 75 76 77 78 79 80 81 82 83 84 85 86 97 98 99  11   14 15 16 17 18 19 20 21 22 23 24 25 26 7 7 6 5 4 3 2 1 0   0 1 0 0 0 0 4 5 You don't argue that Andrew abrogates our factors under CYPRUS, do you? What I believe, your Honor, is that it heightens those factors and those factors have to be considered with consideration of the child's unique circumstances and his potential Here we have a studentogenous who is of relatively average or above average cognitive abilities, and the student not getting what he needs is going to significantly impact on the potential that he has in his future life. Getting back to the 2004 reauthorization of the IDEA, it required that the student services be based on peer-reviewed research to the extent practicable. This change in 2004 was based on a congressional finding that there had been a general failure of the IDEA up until that point to ensure that research based methods and proven methods of teaching were provided to students with disabilities. Some were concerned that the language to the extent practicable was vague and open to interpretation, and it was addressed at 71 FR 4665 in the Code of Federal Regulation where the Department of Education explained that to the extent practical means to the extent possible. Cypress Fairbank Standard fails without fully incorporating the 2004 reauthorization inclusion of methodology and the heightened benefit that is offered or demanded by Andrew F. Our facts here are clear. ABA worked in the prior school district for this child. Evaluative support was provided by Dr. Heath, a private school teacher, and she recommended intensive applied behavioral analysis be a service provided in his school program. The board certified behavioral analysis Hamilton attested that ABA was effective in Florida and it should be continued in Texas. The parent requested the ABA services, and the district not only failed to provide ABA services, but they failed to offer any alternative research based methodology to replace the ABA. They ignored the mandate of the 2004 reauthorization, and they failed to include a methodology in the IEP. The result was regression. The student regressed across all areas of his performance, his behaviors, his academic skills, his communication skills, but most sadly, the regression was evidenced by his reverting to being in diapers. Let me ask the court to take a few moments to look at what I believe is an egregious procedural violation in this matter, which relates to the evaluations. The IDEA requires that students be evaluated in all areas of suspected disability, and that the comprehensive evaluation address all of the student's needs. Take a moment, if you will, to consider Dr. Heath's record at 1527, and compare it to the school district's psychological report, which is at 2055. You will see that Dr. Heath was able to gain results from her evaluation, was able to make very specific recommendations of what this young boy needed in his school placement. Yet, if you look at the school district's eval that they conducted, you will see that it is a very superficial evaluation. They failed to gain results from many of the assessments they administered, and they failed to make any reference at all to this issue of methodology, knowing that the boy had come in here and been successful with ABA. They are completely silent on the issue in that evaluation. That translates over into the IEP meeting, which then also, despite the parent's pleadings for ABA services, fails to address the methodology issue in the IEP, and also fails to provide any methodology. The parent did everything she could in this circumstance. She brought the records from the prior school district. She communicated with the district about the services that had been successful in a prior school district. She brought private evaluations to the IEP team. And recommendations from service providers about what this child needed. And the district failed to address the methodology issue, both in the evaluations and in the IEP. You cannot reconcile-yes? With respect to what was lacking in the initial evaluation, you're just emphasizing that there was no methodology. In the real world, what does that mean? What did they fail to do? A research-based methodology is very common in an IDEA case, where they have studied and had control groups and provided teaching methods, methodologies of instruction to students with disabilities to measure their effectiveness. Right, but what should the school have done? The second school, the school in Texas, what should they have done? The school in Texas first of all should have recognized what had been successful with the child, as this was-ABA was a successful methodology with him. When they did their own evaluation, after that initial transfer period, they decided to do their own evaluation, they should have done an evaluation that identified what this child needed, in particular to the issue of methodology. And they ignored it in the evaluation, and then they ignored it at the IEP meeting, despite the parent pleading for the service. What's your allegation as to what was needed? What specifics are you talking about? There's a number of things that were needed. What I'm focusing on here today is the lack of ABA. And ABA services are provided by people who are specially trained to deliver the ABA services. Some people have a lower degree of training, but are supervised, usually by what is called a board-certified behavioral analysis. And they deliver the service, and it is a building blocks approach to the education, so that the child is building on top of one school after another. Are you arguing that the methodology, the ABA one, was what was used in the prior school district, and that Northside did not adopt the same? Is that part of it? I'm not arguing that they necessarily had to adopt the same. But they can't remain silent on it, and not assure the parent that there is a research-based method of instruction that's going to be provided to her kid that is going to be effective. Let me back up then. In the school district that he transferred from, was that the methodology used there, is that the prescribed methodology that you're advocating should have been maintained or used? Yes. That was ABA in Florida, and the parent was asking for ABA here in Texas. So when the child transferred to Texas, is there any requirement under IDEA or otherwise that there's some consultation between the receiving school district and the transfer or school district in terms of . . . I know that there's an independent obligation to do the evaluation, just asking is there any requirement in IDEA or cases or otherwise that because different from a situation where we're never been in anything, but in the instances where it's a transfer or some existing plan, does the IDEA regulations, anything else, anything speak to some consultation or obligation to pick up from there in doing your . . . Yes, Your Honor. There is an obligation of a school district to gain from the prior school district the educational records, and if necessary, consult with the other school district, and then engage in what Ms. Angelone's going to be talking about, having a comparable service plan until they're able to evaluate the child and develop their own plan of services. So your argument has been principally focused on what you're calling, quote, the egregious procedural violation. Am I hearing you right? Yes. I mean, that's what you've aimed at, the procedural violation. Not solely, but . . . Yes, the procedural violation of evaluations translates into a substantive violation of the child not getting the services. I'm not trying to say that it's not. I'm just trying to understand the thrust of what you've urged to us about methodology and all that, and I heard you say it was, quote, an egregious procedural violation, and I'm trying to appreciate that in light of what I've read in the briefs and blah-di-blah-di, and so I'm just trying to make sure it's a procedural violation because much of what you were saying about Cypress Fairbanks, that it doesn't uptick it in terms of Andrew, I'm listening, but you're urging this procedural violation, right? Yes, Your Honor, because that procedural violation ties in also to that 2004 reauthorization that causes, or is intended to force school districts to provide these research . . . I got you. So my question then, if that's what you're urging, is,  to Judge Ezra in the district court, and although I've read the report, I don't remember it now in the context of this, tell me what the district court said or did about the procedural violation argument. You want to just tell me succinctly, don't give me . . . Succinctly, at the district court, the judge determined that a variety of tools and techniques were used in the assessment, and therefore it was appropriate, and I was going to get to that, but I see I'm running out of time, but the issue is that limited variety of tools in his assessment, variety of tools and techniques, language he used, is not sufficient to appropriately evaluate this child, who particularly needed a behavioral methodology to be included and recommended in that evaluation. I got you. I'm just trying to discern, number one, I want to make sure that the same argument that you, not you personally, that's being presented to us here, in terms of this procedural violation, is the same scope, depth, and breadth of argument that was made to the district court, so we can fairly discern how that argument was dealt with by the district court in our overall evaluation of this procedural. That's all I'm trying to pinpoint, and I think you've helped me to get there. There's rebuttal time to come back up, but at least I think I understand the purposes of where we are. I'm not trying to cut out that that's the only argument you're making, but just to make sure I'm clear, you're alleging a procedural violation vis-a-vis this methodology and all of that, right? Yes, Your Honor. All right, got you. All right, Ms. Angelone. Good morning. May it please the Court. My name is Elizabeth Angelone. The IDEA's transfer provision requires the new school district to provide FAPE by providing comparable services under the then-existing out-of-state IEP during the initial transfer period. This Court found in Dallas v. Woody that a comparable services provision ensures that all students eligible for special education have a FAPE available to them during all relevant time periods, including the first 30 days. This is even more critical for military families who are transferred frequently throughout a student's academic career, and continuity was essential for this family and was essential for this child, especially given his diagnosis of autism. Also in the Woody case, this Court determined that IDEA's transfer provision illustrates IDEA's policy that no students with disabilities fall through the cracks of administrative procedure. Yet this student fell victim to bureaucratic inertia and was denied a substantive FAPE when NISD reduced his services by half, or 50 percent, a reduction of 84 hours within the first 30 days alone, which was critical to his early intervention and academic instruction. The transfer provision not only provides a substantive FAPE to the child, but it also insulates the school district from FAPE challenges, assuming they follow the provision, while they're getting to know the child and waiting for the evaluations. This unilateral reduction is more troubling, given NISD had an existing program, a full-time program, that they could have and should have offered this child. The hearing officer and the District Court both correctly found this child was entitled to a full day of services when he came into Northside ISD. But the reduction in the services, the unilateral reduction in services, and critical peer interactions by three hours daily itself is a failure to implement the comparable services provision. Yes, ma'am. He had a full day in Florida. He came to NISD. They reduced his services unilaterally to three hours a day. Does that mean he had to go back home, or he could stay at school, he just wouldn't have the services? No, he had to return home. So he went to school, he was released 15 minutes early, so it's actually less than three hours, to be taken to the bus and was transported home. And this cannot be said to be comparable or equivalent services under the IDEA's transfer provision. The District Court erred in finding that without regards to IDEA's requirement the services be equivalent not only to the substance of the services, but also to the frequency and duration of the services themselves. In essence, the District Court defanged and rendered toothless the whole transfer provision of the IDEA and created a significantly lesser standard for fate than what the IDEA requires in these limited circumstances of the initial transfer period. In other words, comparable under the District Court's interpretation no longer means comparable similar or equivalent. The District Court also erred in misapplying the facts of this case by holding that the significant reduction services was merely a procedural violation when it was not. The plain language of the statute itself, and was reiterated in the Sterling Court, indicates and dictates that a comparable services provision, comparable services are a requirement for a substantive fate. This is not a procedural violation, this is a substantive one. Therefore, appellant is asking that this Court reject the District Court's substantial weakening of the IDEA's transfer provisions and find that the failure to implement and provide comparable services or equivalent services during this initial 30-day time period was a substantive denial of fate. While the student currently resides in Colorado, continuity of residence cannot be a prerequisite to the grant of compensatory education. Therefore, appellant is requesting this Court order NISD to belatedly pay for the services they should have been paying for all along and order NISD to fund 84 hours of private compensatory services to compensate the child for the denial of services he was mandated to receive during that initial 30-day period. He is receiving services, Your Honor, but compensatory education is designed to make up for what he should have already been receiving. It's not supplemental services, it's compensatory services. Well, I think in the DF case that we filed last night, let's see, by the way, it would be perfectly appropriate in this particular case to establish even a compensatory fund where the child could use those services selected by the parent within a two-year period of time or really even any time until he turns 22 and is no longer eligible. So it wouldn't necessarily be at school? No, ma'am, it could be private services. So he's permanently in Colorado? He is not permanently in Colorado. He is a military family and when he was not getting the services in Norset ISD, his father requested an EMFT transfer for educational purposes to Colorado. He might transfer again in six more months, which is why the comparable provision of the IEDEA is so critical. All right, so assuming if we were to, sort of like the other one, assume for the sake of argument that we found some problem and remanded back to the IEDEA in another one of these arenas of trying to determine, assess, calculate these compensatory services. Is that right? I don't believe remand is necessary for the initial 30-day period. The law is very clear. It has to be comparable or equivalent services. He was denied 84 services. He's entitled to 84 academic services. You want a plenary judgment from us decreeing that quantum of services. I believe he's entitled to the 84 hours of compensatory services for that limited first 30 days. Thank you. May it please the court. I'm Stacey Tour-Castillo representing Northside Independent School District today. I want to kind of go backwards from how they were arguing today. I want to start with comparable services since that was the last thing they addressed. The comparable service provision is very clear. It's unambiguous and it should be interpreted according to its plain meaning which would be similar or equivalent. The Office of Special Education Programs had been asked previously to provide an interpretation of what the term said. It should be interpreted according to its plain meaning, similar or equivalent. The purpose behind that provision is to provide continuity to children transferring between schools and avoid disruption of services while also simultaneously balancing the interests of the district and allowing them time to assess the child during that 30-day transfer period. Only one court today has actually interpreted the provision, what comparable services means and that's out of the District Court of Nevada, the Sterling A case. In that case, the student was receiving speech services at his home and when he transferred to a new school district, he was insisting comparable services meant that that district also needed to provide services in his home. That school district said, no, we have people on staff that can provide that to you at the school campus and that's how we're going to do it and the court agreed with the school district that comparable means similar or equivalent and in that case, as long as he was providing those services, the school was providing those services, the location was irrelevant. It would be an absurd result if we went with plaintiff's interpretation requiring identical IEPs in both of the school districts. For instance, if you're in a smaller school setting or small school district and they don't have the resources available on staff for a particular specialty, the school can provide compensation for them to receive those services that are required for the student to receive FAPE, to receive it in a private setting or pay for a private provider to provide those services. Well, when they transfer to a new school district that's perhaps a larger one, has more resources and they actually have those kind of specialists on staff, it would make sense for that school to provide similar services by providing those services at the school campus with their specialist but if we have plaintiff or appellant's interpretation requiring identical services, then the new school is faced with a situation of, well now we're going to have to bring a private provider on, pay for a private provider to provide those services even though we have people on staff that can provide those services. In our situation, with the Florida IEP, the only thing that is specified in the Florida IEP are the number of minutes for occupational therapy and for speech therapy. Specifically, he was receiving 60 minutes of language therapy per week and 30 minutes of occupational therapy per week in what the IEP called an ESE classroom. Our staff called Florida once we had that IEP and asked them to describe their services so we could better understand it, specifically what the ESE classroom meant because that's not terminology we use in Texas. We learned from a professional student's classroom that they use as a self-contained class. That's primarily with disabled peers where he receives his services. Because that was a representation Florida made to us, we put him in a self-contained classroom for this first 30-day transfer period and we provided in our transfer IEP the exact number of minutes he was receiving in language therapy and in occupational therapy. That was replicated in our transfer IEP. The Florida IEP did not specify the length of his school day. It says nowhere in there how many minutes he goes to school every day. It didn't say he was required to attend a six-hour school day. Granted, we did not ask Florida. We didn't know to ask Florida because at the time we talked to Florida on the phone, mom had not represented to us that he was attending a full day. She had represented to us that he was in a typical classroom that was not a self-contained classroom, but when we called Florida, we found out that was not the case. Did you have their written IEP in hand? We did. It doesn't say in it, you know, length of school day? It does not at all. In fact, when you're working with IEPs, whenever there are services that are required for a student to receive FAPE, it will be specified in the IEP. So if Florida had determined that a full school day was required and six hours of instruction for a full day for a pre-kindergarten student was required, it would have said it in the IEP, and nowhere in the IEP does it say that for him to receive FAPE, he needed to be there for six hours. Do I hear you saying, you heard my question to them about, you know, whether typically not required in a transferring situation, NISD would reach out, not because of a mandate, but to try to tailor whatever the plan is to the student seems logically would be helpful to know, and so I hear you saying that in fact was done to establish the individual plan for this student, right? Right. Okay, so in the course of then fashioning the plan, were these things that the parent, you know, agreed to, or? I mean, well, once you had the collaboration with Florida, you've got it, and you've set it out. I'm just saying, I'm assuming based on Andrew, the parent was engaged with that? Yes, they had a transfer meeting with the parent and went over what, where he was going to be placed for the 30 days, when they were going to provide the speech and occupational therapy services. And take an argument a little bit further in this situation, with Appellant's interpretation that he was somehow denied an extra half a day of preschool services, how would you craft a remedy for that? Because nowhere in the Florida IEP does it specify any other services that he was receiving other than his occupational and speech special education services. So, assuming, for the sake of argument, that we lose on this issue, how would you craft compensatory services when there's nothing speaking to what services he was receiving? It would almost be like they're asking, we want an extra three hours of school for 30 days, but we don't know what's going to be provided during those three hours, because that was not... What was provided at Florida? My opposing counsel says there's no methodology in your evaluation. And I'll get to the ABA stuff in a minute as well, but in Florida, the IEP, when we're listing the special education services, which is what the comparable services is concerned itself with, is what special education services are with speech and occupational therapy. But you don't know what happened the rest of the day? Well, he would have small group instruction academically, but other than... And those are things that we provide in our half-day program. Other than that, what he was doing the other time, no, there's nothing in the IEP that would represent what was happening. What would be the academic reason for not doing a full day versus a half day? Or said a different way, you know, we have some of these where a child becomes disruptive, ya, ya, ya, so, you know, adjustments are made. So, I don't mean a presumption, but subject to something said differently, why wouldn't a full day kind of be the standard, so to speak, as opposed to the half day? We have to remember the age of the child. This time he was four years old, turning five, and the testimony in the record will reflect from the preschool teachers that in Northside, the standard, the default, for lack of a better word, is a half-day program, because regardless of whether the child's disabled or not disabled, that's reflective of the attention span of a four and five-year-old, is a half-day program. They do offer a full day. It's not very common, but it's offered when a special education student has shown that he requires it to make progression on his IEP. And when you look at the record as a whole, for the whole year he was with us, he did not require a full day. He was making progression in the half-day program. Is there something in the record from some expert or otherwise that's in the record that opines one way or another, you know, from their side that should have been pulled, it should have been this, it should have been that? There's not. On comparable services, is the short of it, you would say the plaintiffs wanted, quote, identical services with? Is that the way you appreciate the argument? That is how I understand their argument. That's how I understand the argument made by their amicus brief that was supporting their position was identical services, and that's not reflective of what IDEA is intending to do. They're trying to give deference to the school to assess what they were providing at the other school district and see how they can provide those same services within their school district. Next, I want to turn to his arguments on methodology, the ABA program. The law only requires that under 34 CFR 300.304 that the school district use a variety of assessments and tools and strategies to gather relevant information about the child and develop strategies to educate the child. It prohibits the use of only using a single measure or assessment, and as the district court and the hearing officer found, the district used a variety of assessments to assess the student during the course of his time at Northside ISD. We had a speech pathologist that performed assessments. We had occupational therapy performing assessments. We had LSSP performing assessments, in addition to reviewing what Florida's assessments had shown. There's no evidence at all that somehow we weren't using evaluations, observations, parental input, outside provider input in developing this child's IEP. On the ABA services, what the appellants failed to mention in their argument is that the ABA services were not part of his Florida IEP. They were provided by a private provider that the Florida schools allowed to come onto campus, observe the child in the classroom, provide input at the ARD meetings, and confer with the teachers if the teachers wanted to confer with the ABA provider. Northside ISD told the parent, we will allow you to do the same thing. You may bring a private provider on campus, observe the classroom, and offer the private provider to participate in the ARD meetings. In fact, the private provider did participate in the ARD meetings and provided input at the ARD meetings. There's not an issue of Northside completely excluding the type of service that the mom was requesting. We don't hire parents outside providers to provide services on our campus. We have people on staff that are trained in ABA. We've told the mother that. We had behavior specialists that have been trained in ABA that went with the mom to observe on classrooms and provided input at the ARD meetings and helped develop the IEP for this child. The bottom line what this comes down to is whether the child was provided faith. And in looking at that, Michael F. factors still apply. The court has had special education come up since the Andrew F. case and the court still applies the Michael F. factors. Whether the program was individualized for the student, the record is clear that it was. Every assessment was specific to this child and IEP developed based on those assessments. It was administered in the least restrictive environment. In this case, he was in a collaborative classroom after that first 30-day period where he transferred into the school. And granted he was in that self-contained classroom because that's what Florida represented their ESE classroom was. After that 30-day period and after our assessing him and evaluating him, he was placed in a collaborative classroom with non-disabled peers. In other words, he was being mainstreamed. So there's not going to be an issue of whether he was mainstreamed or not. Yes, he remained in the half-day program. His services were provided in a coordinated and collaborative manner with all the key stakeholders. Mom attended every ARD meeting. Teachers communicated with Mom on a regular basis, sending daily communication logs home. At one school, one of the teachers communicated with her via a smartphone app to keep her apprised of what was going on in the classroom and how he was progressing. Mom requested visual schedules and daily behavior data, which the teacher sent to Mom. And we've allowed Mom to observe her child in the classroom as well as bring her private providers on campus to observe the child and make recommendations. When Mom requested campus transfer, we granted the transfer and let the child move to a different campus. When they requested occupational therapy, even though at the time we felt he had made enough progress, he no longer required it, we allowed Mom, we conceded with Mom to allow additional occupational therapy for the child. And in terms of him benefiting from the program, academically he was one of the top students in his classroom in the academic subjects. He was making great progress in literacy, language, reading, and math. And his behavior charts from the teachers, the teachers were keeping tally charts on his behavior and seeing how he was doing from the beginning of school year throughout the school year and how he was progressing. His original behavior program was addressing his tantrums and his spitting. And the record shows that the program we were using and working with the student was allowing him to be successful in the program. He went from a high of 44 episodes of spitting in week five of school, and it dropped down the last five weeks to seven, eight, two, four, and zero, respectively. Same thing with hitting. He went from a high of 19 episodes of hitting down to the last four weeks of school going from zero to seven, one, and then the final week having zero incidents of hitting. He was progressing from using visual prompts to verbal cues and using language to express his frustrations and his emotions. We also addressed some of his chewing behaviors. He had issues chewing non-edible objects and those were also addressed in his IEP, and he was progressing that. We provided a chewy for him to use to avoid chewing on other things, and that progressed to him responding to verbal redirection where he no longer needed that device. So, and Tom, I don't want to belabor the point. All of these evidence of his progression and his academic and non-academic benefits are set out in our brief, and I'll rely on our brief for the remainder of those points. I do want to point out before I close that on page 15 of my brief, I mistakenly referred to an independent evaluation as being conducted in spring 2016, and it actually was spring 2017. I listed the wrong year, and the hearing officer at the time also, in her opinion, listed the wrong year for that IE as well. I ask that the court affirm what the hearing officer and the district court found after reviewing the record that this child was provided FAPE, and there's been no procedural substantive violations. Thank you. All right. Back to you, Mr. Cuddy. Thank you. On the issue of compensatory educational services, in these matters because they're not resolved in a very timely manner, the compensatory education determinations are often remanded back to the district court for the parties to work out. More often than not, a compensatory award would be calculated into some sort of dollar value and set aside in a fund for the parents to access it. Those services would be accessed in a variety of different ways, depending on usually what becomes an agreement between the parties, where the student may receive those services over school breaks, may receive them in an extended school day, or may receive them over the summer break. In older students, those compensatory services are often an extension of his eligibility beyond the age of 21. The court does have broad equitable powers here, and the Minor case that was submitted yesterday to the court, and the progeny of Minor indicates that the equitable relief is in the form of educational services. The families do not have any right to damages, in a sense, for the deprivation of services. It's this equitable relief, and in this case, the equitable relief necessarily has to come later. In that progeny of cases, it talks about how this equitable remedy of compensatory services is what's available to families that can't make those private placements when their child's being deprived of faith. The family of wealth can place their child in a private school and then seek reimbursement, but a family that doesn't have that financial ability simply has the remedy of seeking the equitable relief. The Sterling reference by opposing counsel is a straw man. In the Sterling case, the family was moving from a home-based service program into a new district, and the district offered a change in location to services, not a change in services. That's completely different than what happened here, where, instead of having services that were both substantially similar and equivalent, they reduced the services in half to half a school day. There was no equivalency to that. In the context of special education services, they frequently talk about the duration, the frequency, and the method of delivery. And here, they changed the duration of the student's delivery of his school day. The parent did bring this to their attention immediately when she knew they were offering the half day, and they took no action to clarify with the Florida School District whether or not he actually had a full school day. Although the district has posited, both at hearing and here in this court, that they had ABA providers, there was no evidence of any ABA services being provided to the student in any way. In fact, the initial teacher, Ms. Davila, who was working with the student, was examined at hearing, and she testified she had no experience, no training whatsoever in the ABA methodology or any other methodology. This court does have broad equitable powers on this compensatory service issue, and just because of the timing of these hearings and the end result of the litigation and these types of things, my experience is that it does get remanded back to the district court  And I think that's a good thing. It's a good thing for determination of what exactly the deprivation period was and what services may be owed, and then usually the parties work out between themselves how those services are going to be delivered. Also, Judge Stewart, you asked about whether or not there was some expert testimony about whether or not the reduction of services was warranted when he entered the school district here in Northside, and yes, Dr. Heath, who was qualified as an expert and testified in the hearing, did say that because of the severity of his needs, she would not agree with a reduction of his school day as occurred. Thank you. Thank you, counsel, for both sides, for your arguments in this case as well as the other one that we have. We will take them both under advisement. On the other case from the other day, we're still thinking about the proposition of whether we want some kind of supplementary briefing done. It's not a done deal yet, but if we do, we'll write you and let you know that. Not saying we will, but we'll come to that thought. All right, with that, that concludes the cases that this panel has for oral argument. The panel will stand adjourned.